### In re APPORTIONMENT OF HOUSE OF REPRESENTATIVES.

Supreme Judicial Court of Maine.

.Feb. 14, 1974.

---

## ORDER

Whereas the Supreme Judicial Court, the Justices unanimously agreeing thereto, has made the apportionment of the House of Representatives and has established one hundred eight (108) single member districts and eleven (11) multi-member districts for the choice of its one hundred fifty-one (151) members by order dated February 14, 1974.

Whereas the Supreme Judicial Court has caused said order, including a preliminary statement respecting principles used by the Court in the discharge of its constitutional obligation, to be deposited with the Secretary of State in the office of the Secretary of State,

NOW, THEREFORE, IT IS HEREBY ORDERED that a copy of said order and preliminary statement of principles be deposited with the Administrative Assistant to the Chief Justice, kept and recorded as a permanent record of the redistricting of the House of Representatives pursuant to Article IV, Part First, Sections 2 and 3 of the Constitution of Maine.

Said order including preliminary statement of principles shall be recorded in the Maine Reporter.

Dated this 14th day of February, 1974.
    For the Court
    s/ ARMAND A. DUFRESNE, Jr.
    Chief Justice

## STATEMENT OF PRINCIPLES

We, the Justices constituting the Supreme Judicial Court of Maine, have noticed that, as is commonly known, the Maine Legislature failed to make an apportionment of the House of Representatives by midnight of January 16, 1974, the end of the period in which the Legislature was required by the Constitution of Maine to make such apportionment.

Accordingly, as the Supreme Judicial Court, we have entered upon the discharge of the responsibilities constitutionally imposed upon us (Section 3, Part First, Article IV of the Constitution of Maine) to make the apportionment.

1.

Our investigations confirm as still correct the opinion given by the Justices on June 22, 1973 (in answer to particular questions then propounded by the House of Representatives) that a full compliance with the literal requirements of Sections 2 and 3 of Part First of Article IV of the Constitution of Maine renders a federally

". . . constitutionally permissible reapportionment of the House of Representatives . . . unattainable as a practical matter . . . ." Opinion of the Justices, Me., 307 A.2d 198, 210 (1973)

The further questions now arise, however: (1) must the apportionment objectives and methods of the Constitution of Maine be totally discarded and (2) if not, must, or should, we retain as much of the letter and spirit of the apportionment mandates of the Maine Constitution as may be reasonably consistent with fulfillment of the governing federal constitutional standards?

Adequate understanding of the scope of the problem raised by these questions, and the formulation of satisfactory answers to them, necessitate that we delineate more extensively than was appropriate in the

Opinion of the Justices, supra, the federal constitutional principles which are controlling.

### 2.

When the Supreme Court of the United States first pronounced—in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)—that the equal protection clause of the Fourteenth Amendment to the Constitution of the United States requires that the seats in both houses of a bicameral State legislature must be apportioned to yield approximately equal population among the various legislative districts, the Court simultaneously observed that:

"A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, . . . in designing a legislative apportionment scheme." (p. 578, 84 S.Ct. p. 1390)

The reason for the "legitimacy" of such State policy was conceived to be that

"[l]ocal governmental entities are frequently charged with various responsibilities incident to the operation of state government. In many States much of the legislature's activity involves the enactment of so-called local legislation, directed only to the concerns of particular political subdivisions." (pp. 580, 581, 84 S.Ct. p. 1391)

Reynolds v. Sims warned, however, that in any particular apportionment of a legislative house a State policy of maintaining the integrity of the boundaries of political subdivisions will be "carried too far" if it causes

"a total subversion of the equal-population principle in that legislative body." (p. 581, 84 S.Ct. p. 1391)

In 1973 the Supreme Court of the United States confronted, in an actual decisional context, the problem of indicating the limits of the range of deviation which, if resulting as an incident to a State policy of preserving integrity of political subdivision lines, is thereby "justified" to become a constitutionally "tolerable" range. In Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), and as we previously mentioned in the Opinion of the Justices, supra, a "16-odd percent maximum" total deviation was held justifiable;

". . . suspect [would be] any appreciable excess . . . ." (p. 208 of 307 A.2d)

The subject of "tolerable" deviation was cast in a different mold in Gaffney v. Cummings, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973). Whereas in Mahan v. Howell, supra, the Court had been concerned with a large deviation from population equality as "prima facie" unconstitutional but "justifiable" by the State's consistently followed policy of maintaining political subdivision boundaries fully intact, Gaffney v. Cummings established the principle that:

". . . in the context of the eminently reasonable approach of *Reynolds v. Sims,* . . . minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." (p. 745, 93 S.Ct. p. 2327)

In Gaffney v. Cummings the

". . . House districts under the [Connecticut] State Apportionment Board's plan varied in population from one another by a *maximum* of only about 8% and . . . the average deviation from the ideal House district was only about 2%." (p. 751, 93 S.Ct. p. 2330)

As to such plan the Court decided:

". . . we are quite sure that a prima facie case of invidious discrimination under the Fourteenth Amendment was not made out." (p. 751, 93 S.Ct. p. 2330)

■ It is now clearly settled, therefore, that a "de minimis" range of deviation

may exist in any State apportionment plan, as absolutely "tolerable" and requiring no independent policy justification; and such "de minimis" deviation will produce no federal constitutional infirmity unless it causes *in fact* an actual effect otherwise cognizable as invidiously discriminatory under Fourteenth Amendment standards.

■ More specifically, in light of Gaffney v. Cummings taken together with its companion case of White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 2342, 37 L.Ed.2d 314 (1973), that a State plan of apportionment may profess a policy of maintaining the integrity of political subdivision boundaries but carries it out inconsistently, or even haphazardly, will not, *as such,* constitute a separate and independent invidious discrimination so long as the plan's deviation range is within the "de minimis" limits. This conclusion derives from the proposition that vis-a-vis the federal Fourteenth Amendment "de minimis" deviations require no separate justification and, hence, whether a State has, or has not, a policy as to the intactness of political subdivision lines becomes immaterial.[1]

The same basic principles emerge in relation to the use, specifically, of multi-member districts.

In White v. Regester, supra, the Supreme Court of the United States explicitly considered multi-member districts, and summarizing the full import of the apportionment cases from 1963 forward, concluded:

"Plainly, under our cases, multimember districts are not *per se* unconstitutional, nor are they necessarily unconstitutional when used in combination with single-member districts in other parts of the State." (p. 765, 93 S.Ct. p. 2339)[2]

Referring to the respect in which multi-member districts (as, indeed, also single-member districts) can produce unconstitutionality—i. e., when the particular manner in which they are used creates an actual effect ". . . invidiously to cancel out or minimize the voting strength . . ." (p. 765 of 412 U.S., p. 2339 of 93 S.Ct.) of identifiable constituencies—the Court stressed, adhering to its persistently held view that a violation of constitutional equal protection does not result from the

---

1. These facets of the decisions in Gaffney v. Cummings and White v. Regester become most sharply visible when we focus upon particular facts stressed in the dissent of Mr. Justice Brennan. In the Connecticut Apportionment Plan which the Court approved:

"'[t]he boundary lines of 47 towns are cut . . . so that one or more portions of each of these 47 towns are added to another town or a portion of another town to form an assembly district.' . . . Moreover, the boundary lines of 29 of these 47 towns . . . [are] cut more than once, and the plan create[s] '78 segments of towns in the formation of 151 assembly districts.'" (p. 775 of 412 U.S., p. 2344 of 93 S.Ct.)

2. In Lucas v. Colorado General Assembly, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964) the Court had observed that a multi-member district has a weakness because it may obliterate "identifiable constituencies" by depriving them ". . . [of a] single member . . . elected specifically to represent them." (p. 731, 84 S.Ct. p. 1471)

Yet, likewise on this matter of identifiable groupings who may lack a voice in the legis-

lative halls, the Court pointed out in Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971):

"As our system has it, one candidate wins, the others lose. Arguably the losing candidates' supporters are without representation since the men they voted for have been defeated; arguably they have been denied equal protection of the laws since they have no legislative voice of their own. This is true of both single-member and multi-member districts. But we have not yet deemed it a denial of equal protection to deny legislative seats to losing candidates, even in those so-called 'safe' districts where the same party wins year after year." (p. 153, 91 S.Ct. p. 1874)

Moreover, in Whitcomb v. Chavis, supra, the Court was at pains to make clear that if multi-member districts have undesirable features, single-member districts are likewise characterized by infirmities. Single-member districts have their

". . . own capacit[ies] for overrepresenting and underrepresenting parties and interests and even for permitting a minority of the voters to control the legislature and government of a State." (p. 160, 91 S.Ct. p. 1878)

fact alone that a ". . . group . . . has not had legislative seats in proportion to its voting potential" (pp. 765, 766 of 412 U.S., p. 2339 of 93 S.Ct.) (and see footnote 2 ante, discussing Whitcomb v. Chavis), that a group alleging invidious discrimination against it must

". . . produce evidence to support findings that . . . its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." (p. 766 of 412 U.S., p. 2339 of 93 S.Ct.)

■ White v. Regester is thus the most recent expression of the view frequently asserted by the Supreme Court of the United States that the use of multi-member districts in a State's apportionment plan creates no *per se* invalidity under the equal protection clause of the Fourteenth Amendment. This means, as shown by White v. Regester, the resort to multi-member districts produces not even a prima facie wrongfulness—which must be justified by a showing that it is necessary to use them to implement a State policy consistently followed—so long as (1) any deviation from the ideal of exact equality of population among all districts which may in fact result falls within the "de minimis" range indicated in White v. Regester, and (2) there is otherwise no actual invidious discrimination.

These conclusions are most cogently illustrated by the precise facts of White v. Regester. The Texas apportionment plan, as sustained by the Court in White v. Regester, intermixed, even among the heavily populated urban areas, multi-member and single-member districts. Further, of the eleven multi-member districts eight were neither confined within, nor con-

gruent with, but cut across county geographical lines (the Texas policy being to strive to preserve the integrity of each county as a political subdivision).[3] Finding in this pattern no violation of equal protection under the federal Fourteenth Amendment, the Supreme Court of the United States remarked:

"it appears . . . that to stay within tolerable population limits it was necessary to cut some county lines and . . . the State achieved a constitutionally acceptable accommodation between population principles and its policy against cutting county lines in forming representative districts." (n. 8, at pp. 764, 765 of 412 U.S., at p. 2339 of 93 S. Ct.)

■ The foregoing analysis of the federal law crystallizes, in summary, two salient principles for guidance in the development of a State's apportionment plan. First, and generally, federal standards of "equal protection" are met, without any need for overriding State policy justifications, so long as the deviations from the ideal of exact arithmetical equality in each district are within the "de minimis" range[4] and no actual invidious discrimination is otherwise produced. Second, and specifically, multi-member districts may be utilized as the State deems appropriate—including having them cutting across the boundaries of political subdivisions—again subject only to the general principle that deviations from the arithmetical ideal be "de minimis" and there be no actual invidious discrimination; and even more specifically in this latter aspect, that an "identifiable constituency" within a multi-member district ". . . has not had legislative seats in proportion to its voting potential" (p. 766 of 412 U.S., p. 2339 of 93 S.Ct.) fails, ipso facto, to establish invidious dis-

3. While this fact was not mentioned expressly in the Supreme Court's opinion in White v. Regester, that it was a fact in the case is stated affirmatively in the opinion of the three-judge Court whose decision was being reviewed in White v. Regester. See:

Graves v. Barnes, 343 F.Supp. 704, 718 (D.C.1972).

4. The dissent of Mr. Justice Brennan in Gaffney v. Cummings reveals that this "de minimis" range is most probably a maximum total deviation of 10%.

crimination, since it must be proved that the group was actually denied *opportunity to participate* in the political processes and thereby elect legislators of their choice.

### 3.

Application of the foregoing federal constitutional principles to the apportionment provisions contained in Sections 2 and 3 of Article IV of the Constitution of Maine creates a conflict between the State and federal Constitutions which arises most particularly because of the special methodology prescribed in the Maine Constitution to achieve its important objective of

> "facilitating enactment of statutes of purely local concern and preserv[ing] for voters in the political subdivision[s] a voice in the State Legislature on local matters." See: Opinion of the Justices, supra, at p. 208 of 307 A.2d.

The difficulty lies fundamentally in the command of Section 2 of Article IV that the *first step* in the apportionment process must be the apportionment of Representatives to the *counties* (the number of Representatives for each county to be "in the same proportion to the total number of Representatives as the number of inhabitants of the county bears to the number of inhabitants of the State, fractional excesses over whole numbers to be computed in favor of the counties having the larger fractional excesses.") This, in turn, makes it necessary, thereafter, that the apportionment *within counties* must proceed (as provided in Section 3) by use of a separate "unit base number" for each county (computed by dividing the total number of inhabitants in the county by the number of Representatives apportioned to the County).

■ As Maine's population is presently, and in the foreseeable future will be, distributed, this absolutistic "County-primacy" approach of the Constitution of Maine runs afoul of the federal Constitution because it necessitates the creation of districts in which the maximum deviations from population equality far exceed not merely the "de minimis" range indicated by Gaffney v. Cummings and White v. Regester but also that much larger range revealed by Mahan v. Howell, which although prima facie excessive, may be salvageable when justified by a State's consistently implemented policy of maintaining the integrity of its political subdivisions. See: Opinion of the Justices, supra, at pp. 208 and 210.

Simultaneously, however, on the basis of various materials brought to our attention and information derived from our own research, we are satisfied that by (1) relinquishment of the above-described "County-primacy" facet of the Maine Constitution and its concomitant that a separate "unit base number" of apportionment be used within each County and (2) resort to a unit base number reflecting ideal arithmetical equality (computed by dividing the total number of inhabitants in the State by the total number of Representatives to be apportioned throughout the State), we can achieve a pragmatically effective and rational accommodation between the "equal protection" demands of the federal Fourteenth Amendment and the basic spirit and letter of the Maine Constitution insofar as it manifests an important State interest that localities be afforded a collective local voice in the Legislature on matters which lie within their fundamentally local concern.

Such accommodation can be developed by a calculated undertaking to create districts which involve as little crossing of the boundaries of the largest political subdivisions, the counties, as is reasonably practicable to ensure that we hit, as our target, that range of deviation from population equality among the districts which falls within the "de minimis" limits of Gaffney v. Cummings and White v. Regester. If this be done, we need not be worried whether County lines have been observed with that practically absolute consistency necessary as justification for deviations of the magnitude involved in Mahan v. Howell.

■ A similar approach enables us to preserve, substantially, the important objective of the Constitution of Maine that the political subdivisions next largest in size to the counties—the more populous cities and towns—shall have an effective legislative voice on matters affecting their purely local interests; and especially insofar as the use of multi-member districts is the constitutionally prescribed mechanism to accomplish this objective by preventing the fragmentation of the populous cities and towns.

This result may be readily achieved if we establish, and fulfill, criteria for the formation of multi-member districts as follows.

(1) The number of multi-member districts to be formed shall be equal to the number which would have resulted from literal observance of the apportionment provisions of Sections 2 and 3 of Article IV of the Maine Constitution.

(2) As far as is reasonably practicable consistently with the federal mandate of districts of "equal population", multi-member districts shall be formed to coincide exactly with the geographical boundaries of the cities or towns required to be multi-member districts under a strict adherence to Sections 2 and 3 aforesaid of the Maine Constitution.

(3) Insofar as federal "equal population" strictures may necessitate that multi-member districts be formed which are not exactly congruent with the boundaries of any single city or town:

(a) each city or town which has not become, as such, a multi-member district by virtue of (2) above but would have been required to be a multi-member district by a literal compliance with Sections 2 and 3 of Article IV of the Constitution of Maine must have such number of its inhabitants contained in a multi-member district (formed by us) as is sufficient (at minimum) to entitle such multi-member district (as formed by us) to the same number of Representatives to which said city or town would have been entitled under said Sections 2 and 3 of Article IV; or

(b) if the *total* population of a city or town required by a literal observance of· Sections 2 and 3, aforesaid, of the Maine Constitution to be a multi-member district is made part of a multi-member district formed by us, and such total population contains the unit base number being utilized by us (i. e., the number which gives arithmetical equality of population in each district) a multiple whole-number of times *plus* a fractional amount exceeding one-half of said unit base number, such multi-member district may include, additionally, such number of the inhabitants of any contiguous city, town or plantation as will be sufficient to produce a compliance with federal "equal population" requirements and simultaneously to entitle such multi-member district to one (but only one) Representative more than the number of Representatives to which the city or town whose total population has been included would have been entitled under a literal compliance with Sections 2 and 3 aforesaid of the Maine Constitution.

(4) No multi-member districts shall be created except in accordance with the provisions of (2) or (3) aforesaid.

■ In light of all of the foregoing, and since we are a tribunal of the State of Maine which (because of unique circumstances) has been assigned a special responsibility by the Constitution of Maine to make an apportionment of the House of Representatives of the Maine Legislature, we consider that it is our sworn duty to be governed by the Constitution of this State to the fullest extent reasonably possible consistently with recognition of the Constitution of the United States as the Supreme

law of the land.[5] To the extent, as above delineated, we are able reasonably and substantially to accommodate the basic spirit and a substantial part of the letter of the Maine Constitution to the "equal-population" principle of apportionment commanded by the Constitution of the United States, we are fully convinced that we may not discard entirely the contours of the apportionment program for the House of Representatives of the Maine Legislature as it is delineated by the Constitution of Maine and proceed unrestrained except as we may be controlled by the Constitution of the United States.

More specifically on the subject of multi-member districts, the Constitution of Maine commands that they must be used for all of the more populous cities or towns—to prevent the substantial segmentation of them—unless and until the Legislature has decided by an "affirmative vote of two-thirds of both Houses . . ." (Section 3 or Article IV) that multi-member districts shall nowhere be utilized. No such two-thirds vote has ever been forthcoming. Because of this failure of the Legislature, as the only body empowered by the Maine Constitution to authorize, and require, elimination of the use of multi-member districts, we deem ourselves bound by the Constitution of Maine not merely to make use of multi-member districts but, indeed, to use them maximally in accordance with the Maine Constitution's provisions concerning multi-member districts as such provisions may be reasonably adjusted to meet federal constitutional requirements (and as such result will be achieved under the criteria for the utilization of multi-member districts above delineated).

5. In this respect, we are acting in a capacity different from a United States Court which, in the exercise of its judicial powers, has been required to nullify a State plan of apportionment as inconsistent with federal constitutional standards and must itself, again in the exercise of its judicial powers, provide ". . . [a] judicial remedial process in the reapportionment area . . . ."

4.

The House Apportionment Commission created by the Joint Order (dated July 3, 1973) of the House of Representatives and Senate of the 106th Maine State Legislature submitted in its December 1973 Report to the 106th Maine State Legislature, Special Session (convening in January, 1974) a proposed Plan for the Apportionment of the House of Representatives of the Maine Legislature which, as we have examined it, meets in remarkably substantial measure the principles we have asserted (aforesaid) as controlling.

Moreover, we have held it a governing principle (ante, p. 219) that the Constitution of Maine commands, in the absence of an "affirmative vote of two-thirds of both Houses of the Legislature" requiring that only single-member districts be used, that any plan of apportionment of the House of Representatives must include multi-member districts (as more particularly prescribed by the Constitution). Since the Legislature has failed to produce such two-thirds vote to eliminate multi-member districts, the "reservations" of five members of the House Apportionment Commission—that "single member districts are consistent with the Maine Constitution" and an alternative approach to apportionment in which only single-member districts are created is "preferable"—have been rendered inapplicable; and the plan proposed by the House Apportionment Commission, taken within its own confines and on its own merits, is thus seen to have the *unanimous* endorsement of the House Apportionment Commission as a

". . . conscientious attempt to create generally compact, contiguous districts of equal population . . ."

When thus acting, a federal Court may be obliged totally to ignore a State's policies and concerns as embodied in the State's Constitution. See: Marshall, J., concurring in White v. Weiser et al., 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973), at p. 799; see also: Connor v. Johnson, 402 U.S. 690, 692, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971).

which has

" . . . attempted as much as possible to conform to the Constitution of the State of Maine, deviating where necessary to conform to the equal population requirements of the Constitution of the United States."

We have, therefore, seen fit to make an apportionment of the House of Representatives on a basis which embodies, fundamentally, the Plan submitted by the House Apportionment Commission modified in particular respects which we have considered necessary to achieve complete compliance with the governing principles enunciated by us.

### ORDER

*In compliance with* the provisions of Article IV, Part First, Section 3, of the Constitution of Maine, which read in pertinent part:

"In the event that the Legislature shall fail to make an apportionment, the Supreme Judicial Court shall, within sixty days following the end of the period in which the Legislature is required to act, but fails to do so, make the apportionment,"

and the Legislature having failed to make such apportionment, *pursuant to* the requirements of Article IV, Part First, Sections 2 and 3 of said Constitution of Maine as said sections stand modified by the Constitution of the United States as more specifically outlined in the preliminary statement to this order, which preliminary statement is physically annexed to this order and made a part hereof,

the Supreme Judicial Court, the Justices unanimously agreeing thereto, does hereby make the apportionment of the members of the House of Representatives in the State of Maine by causing the State to be divided into one hundred eight (108) single member districts and eleven (11) multi-member districts for the choice of Representatives, and does hereby ESTABLISH the following districts for the choice of Representatives, as follows:

In the County of Androscoggin where 14 Representatives shall be chosen—

*District Number One,* consisting of the municipalities of Leeds, Livermore, Livermore Falls and Wales, 1 Representative;

*District Number Two,* consisting of the municipalities of Mechanic Falls, Poland and Turner and that part of the town of Minot described as follows: being that portion of the town of Minot westerly of a line beginning at the intersection of the boundary lines of Minot, Auburn and Turner; running south along the Minot-Auburn boundary to the intersection of Brighton Hill Road and Lapham Brook; south along Lapham Brook to the intersection of Lapham Brook and Marston Hill Road; along Marston Hill Road to the intersection of Minot Hill Road; northwesterly along Minot Hill Road to intersection of Center Harris Road; west along Center Harris Road to intersection of Woodman Hill Road and south along Woodman Hill Road to Morgan Brook; west on Morgan Brook to intersection of Verrill Road; southwest on Verrill Road to intersection of Pottle Hill Road; southeast on Pottle Hill Road to intersection of Morgan Brook; directly south on Morgan Brook to Little Androscoggin River; along Little Androscoggin River northwesterly and continuing along the Poland-Turner lines to the Androscoggin-Oxford County line, 1 Representative;

*District Number Three,* consisting of the municipality of Durham and that part of the town of Lisbon described as follows: being that portion of the town of Lisbon beginning at the Sabattus line; thence south on Webster Corner Road to intersection of River Street; north along River Street to Sabattus River to point where No Name Brook crosses Littlefield Road and enters Sabattus River; south on Littlefield Road to Route 196; south on Route 196 to Moody Road; west on Moody Road to Maine Central Railroad tracks; south

along Maine Central Railroad tracks to Winter Street; thence southwest on Winter to Pine Street and intersection with the Maine Central Railroad tracks; south along railroad tracks to Sabattus River; thence following Sabattus River to Durham-Lisbon line and to Androscoggin-Sagadahoc County line; thence north along Androscoggin-Sagadahoc line to Sabattus town line and west along Sabattus town line to point of beginning, 1 Representative;

*District Number Four,* consisting of the city of Auburn and that part of the town of Minot not included in District Number Two, 4 Representatives to be chosen at large;

*District Number Five,* consisting of the municipalities of Greene and Sabattus, together with that part of the town of Lisbon not included in District Number Three and that part of the city of Lewiston described as follows: being that portion of Ward 2 in said city of Lewiston, as presently constituted, beginning at the intersection of College Road and the Greene town line; running south on College Road to Stetson Road; thence easterly along Stetson Road to Hogan Road; south along Hogan Road to Montello Street; thence easterly on Montello Street to Old Greene Road; thence northerly on Old Greene Road to Garcelon Street; thence easterly and southerly on Garcelon Street to Sabattus Street; thence easterly on Sabattus Street to Sabattus town line; thence northerly on the Sabattus town line to the Greene town line; thence northwesterly on the Greene town line to the point of beginning, 1 Representative;

*District Number Six,* consisting of the city of Lewiston except that part of the city of Lewiston included in District Number Five, 6 Representatives to be chosen at large;

In the County of Aroostook, excluding, however, the municipalities of Amity, Bancroft, Cary Plantation, Glenwood, Haynesville, Macwahoc Plantation, Orient, Reed Plantation, and Weston, and the unorganized territories of South Aroostook, where 14 Representatives shall be chosen—

*District Number Seven,* consisting of the municipality of Limestone, excluding, however, therefrom so much of Loring Air Force Base as lies outside of the following described portion of Loring Air Force Base, the hereinafter described portion of Loring Air Force Base being a part of this district, to wit: Beginning at the intersection of the Sawyer Road and the Caribou-Limestone Road (Route 89); thence northerly along the Sawyer Road to the entrance of the Loring Air Force Base known as the "West Gate"; thence easterly on a Base road known as California Road to another Base road known as Rhode Island Road; thence southerly along said Rhode Island Road and continuing southerly along another Base road known as Pennsylvania Road and an extension thereof to intersect said Caribou-Limestone Road (Route 89); thence westerly along the said Caribou-Limestone Road to the point of beginning, 1 Representative;

*District Number Eight,* consisting of the unorganized township formerly known as Connor Plantation and the municipalities of New Sweden, Perham, Stockholm, Wade and Westmanland, and that part of Loring Air Force Base in the town of Limestone not included in District Number Seven, 1 Representative;

*District Number Nine,* consisting of the municipalities of Washburn and Woodland and that part of the city of Caribou described as follows: Beginning at the intersection of Route 1 and the Caribou-Presque Isle city line; thence north along Route 1 and south Main Street to Water Street; thence east along Water Street to Broadway; thence north along Broadway to Elm Street; thence west along Elm Street to Pleasant and East Streets; thence north along Pleasant Street and East Street to North Street; thence west along North Street to Glenn Street; thence south along Glenn Street to Franklin

Street; thence west along Franklin Street to Elmwood Avenue; thence north along Elmwood Avenue to the intersection of Reservoir Street and Harvest Road; thence west along Reservoir Street and Harvest Road to Dorcas Avenue; thence south along Dorcas Avenue to Clover Street; thence west along Clover Street to Prospect Street; thence south along Prospect Street to the intersection of Sweden Street and Woodland Road; thence northwest along Sweden Street and Woodland Road to the Caribou-Woodland town line; thence south along the Woodland-Caribou and Washburn-Caribou town lines to the Presque Isle city line; thence east along the Presque Isle-Caribou line to the point of beginning, 1 Representative;

*District Number Ten,* consisting of the city of Caribou except that part of the city of Caribou included in District Number Nine, 1 Representative;

*District Number Eleven,* consisting of the municipality of Chapman and that part of the city of Presque Isle described as follows: Beginning at the intersection of the Mapleton-Presque Isle town line and Mapleton Road; thence east along Mapleton Road and continuing along Mechanic Street and Judd Street to State Street; thence north along State Street to School Street; thence east on School Street, continuing along Park Street and Allen Street to Charles Street; hence south on Charles Street to Blake Street; thence east along Blake Street to Barton Street; thence south along Barton Street to State Street; thence east along State Street, continuing along Fort Fairfield Road, and Blanchard Road (Rte. 167) to the Presque Isle-Fort Fairfield town line; thence south along the Presque Isle-Fort Fairfield and Presque Isle-Easton town lines to Westfield; thence west along the Presque Isle-Westfield town line to Chapman; thence north along the Presque Isle-Chapman-Mapleton town lines to the point of beginning, 1 Representative;

*District Number Twelve,* consisting of the municipality of Mapleton and that part of the city of Presque Isle not included in District Number Eleven, 1 Representative;

*District Number Thirteen,* consisting of the municipalities of Caswell Plantation, Cyr Plantation, Grand Isle, Hamlin Plantation and Van Buren, and that part of the Unorganized Territory of Northern Aroostook described as follows: Beginning at the southeast corner of New Canada Plantation and running along a brook outletting from California Pond to Square Lake; thence through Square Lake to Goddard Brook; thence along Goodard Brook approximately 2 miles to the first woods road crossing said Brook; thence east along said road to Westmanland Plantation; thence north and east along Westmanland Plantation town line to Stockholm; thence north and east along the Stockholm town line to Cyr Plantation; thence north along the Cyr Plantation and Van Buren town line to Grand Isle; thence west along the Grand Isle, Madawaska, St. Agatha and Frenchville town lines to New Canada; thence south along the New Canada town line to the point of beginning, 1 Representative;

*District Number Fourteen,* consisting of the municipalities of Allagash Plantation, Ashland, Castle Hill, Eagle Lake, Garfield Plantation, Masardis, Nashville Plantation, New Canada Plantation, Oxbow Plantation, Portage Lake, St. Francis Plantation, St. John Plantation, Winterville Plantation and all that part of the unorganized territories in Northern Aroostook not included in District Thirteen, 1 Representative;

*District Number Fifteen,* consisting of the municipalities of Fort Kent, Frenchville and Wallagrass Plantation, 1 Representative;

*District Number Sixteen,* consisting of the municipalities of Madawaska and St. Agatha, 1 Representative;

*District Number Seventeen,* consisting of the municipalities of E. Plantation, Easton, Fort Fairfield and Westfield, 1 Representative;

*District Number Eighteen,* consisting of the municipalities of Blaine, Bridgewater, Hammond, Littleton, Ludlow, Mars Hill, Monticello, New Limerick, Smyrna and the unorganized territories of Central Aroostook, 1 Representative;

*District Number Nineteen,* consisting of that part of the town of Houlton described as follows: Beginning at the intersection of Route 1–95 and B Stream; thence east along Route 1–95 to the Old Foxcroft Road; thence south along the Old Foxcroft Road to the Houlton-Hodgdon town line; thence west along the Houlton-Hodgdon town line to its intersection with an unnamed brook located 2300 feet west of Route # 1; thence north along said unnamed brook to its meeting with the Meduxnekeag River; thence north along Meduxnekeag River to its intersection with the B stream; thence north along B stream to point of beginning, 1 Representative;

*District Number Twenty,* consisting of the municipalities of Benedicta, Crystal, Dyer Brook, Hersey, Hodgdon, Island Falls, Linneus, Merrill, Moro, Oakfield and Sherman, and that part of the town of Houlton not included in District Number Nineteen, 1 Representative;

In the County of Cumberland, excluding, however, the town of Brunswick, where 27 Representatives shall be chosen—

*District Number Twenty-One,* consisting of the city of Portland, 10 Representatives to be chosen at large;

*District Number Twenty-Two,* consisting of the municipality of Falmouth, 1 Representative;

*District Number Twenty-Three,* consisting of the municipality of Windham, 1 Representative;

*District Number Twenty-Four,* consisting of the municipalities of Bridgton, Casco, Harrison, Naples and Otisfield, 1 Representative;

*District Number Twenty-Five,* consisting of the municipalities of Cumberland and Harpswell, 1 Representative;

*District Number Twenty-Six,* consisting of the municipalities of Baldwin and Standish, and that part of the town of Gorham described as follows: being that portion of the town of Gorham to the west of a line beginning at the intersection of the Gorham-Windham and Standish boundaries; thence south on the Gorham-Windham boundary (Presumpscot River) to the intersection of Gambo Road; thence southwest on Gambo Road to the intersection of State Highway 237 (Sebago Lake Road); thence southeast on Highway 237 to intersection of Newell Street and Huston Road; thence southeast on Newell Street to intersection of U. S. Highway 202; thence south on Highway 202 to the Little River; thence south on the Little River to convergence of Tannery Brook; thence south on Tannery Brook to intersection of State Highway 114 (Fort Hill Road); thence northwest on Highway 114 to intersection of Lovers Lane; thence southwest on Lovers Lane to Cressey Road; thence along Cressey Road to intersection of U. S. Highway 202; thence southwest on Highway 202 to the York County-Gorham boundary, 1 Representative;

*District Number Twenty-Seven,* consisting of the municipalities of Freeport and Pownal, and that part of the town of Gray described as follows: beginning at the intersection of the Gray-New Gloucester boundary and the Maine Turnpike; thence south along the Maine Turnpike to Rte. 26; thence southeast on Rte. 26 to Dutton Hill Road; thence west on Dutton Hill Road to unnamed road running parallel on western side of Maine Turnpike; thence south on the unnamed road to Emery Road; thence southwest on Emery Road to the Gray-Windham boundary; thence along the Gray, Cumberland, North Yar-

mouth and New Gloucester boundary lines to point of beginning, 1 Representative;

*District Number Twenty-Eight*, consisting of the municipalities of North Yarmouth and Yarmouth, 1 Representative;

*District Number Twenty-Nine*, consisting of the municipalities of New Gloucester, Raymond and Sebago, and that part of the town of Gray not included in District Twenty-Seven, 1 Representative;

*District Number Thirty*, consisting of that part of the town of Gorham not included in District Number Twenty-Six and that part of the city of Westbrook described as follows: being that part of the city of Westbrook west of a line beginning at the most southerly crossing of the Presumpscot River at the Westbrook-Gorham boundary; thence southeast on the Presumpscot River to the intersection of Bridge Street; thence south on Bridge Street to intersection of Main Street; thence west on Main Street to the intersection of Saco Street; thence southwest on Saco Street to the Westbrook-Scarborough boundary, 1 Representative;

*District Number Thirty-One*, consisting of that part of the city of Westbrook not included in District Number Thirty, 2 Representatives to be chosen at large;

*District Number Thirty-Two*, consisting of that part of the municipalities of Cape Elizabeth, Scarborough and South Portland as hereinafter respectively described; a) that portion of the town of Cape Elizabeth, beginning at the intersection of the boundaries of Cape Elizabeth, South Portland and Scarborough; thence northeast along the Cape Elizabeth-South Portland boundary to Route 77; thence southeast on Route 77 to intersection with Spurwink Avenue; thence south on Spurwink Avenue to intersection of Bowery Beach Road; thence southeast on Bowery Beach Road to intersection with Fowler Road; thence northeast on Fowler Road to intersection with Route 77; thence south on Route 77 to Breakwater Farm Road; thence south on Breakwater Road to the Coastal Cape Elizabeth boundary; and inclusive of Richmond Island; thence west along the coastal Cape Elizabeth boundary to the Cape Elizabeth-Scarborough boundary; thence along the Cape Elizabeth-Scarborough boundary north and west to point of beginning, and b) that portion of the town of Scarborough, beginning at the South Portland-Scarborough boundary at the intersection of the boundary with the Boston and Maine Railroad track (Maine Line); thence east along the boundary to intersection with the Cape Elizabeth boundary; thence east and south along the Scarborough-Cape Elizabeth boundary to the coastal Scarborough boundary to Route 207; thence north along Route 207 (Black Point Road) to intersection of Highland Avenue; thence west on Highland Avenue to the intersection of the Nonesuch River; thence north along the Nonesuch River to intersection of Old Eastern Division Railroad tracks; thence northeast along the Railroad tracks to point of beginning, and c) that portion of the city of South Portland, beginning at the South Portland-Scarborough boundary; thence northeast along U. S. Route 1 to intersection with Broadway; thence east on Broadway to intersection with Evans Street; thence southeast on Evans Street to intersection with McKinley Street; thence along McKinley Street to intersection with Highland Avenue; thence northeast on Highland Avenue to convergence of Kimball and Trout Brooks; thence southeast along Trout Brook to its intersection with Boothby Avenue; thence south on Boothby Avenue to intersection with Parrot Street; thence east on Parrot Street to intersection with Cormier Drive; thence southeast on Cormier Drive to intersection with Sawyer Street; thence southwest on Sawyer Street to intersection with Spurwink Avenue; thence southeast on Spurwink Avenue to the Cape Elizabeth-South Portland boundary; thence along the Cape Elizabeth-South Portland line south and west to point of beginning, 1 Representative;

*District Number Thirty-Three,* consisting of that part of the town of Scarborough not included in District Number Thirty-Two, 1 Representative;

*District Number Thirty-Four,* consisting of that part of the town of Cape Elizabeth not included in District Number Thirty-Two, 1 Representative;

*District Number Thirty-Five,* consisting of that part of the city of South Portland not included in District Number Thirty-Two, 3 Representatives to be chosen at large;

In the County of Franklin, including the municipalities of Canton, Dixfield and Peru in Oxford County, but excluding the unorganized territories of West Central Franklin and the municipality of Rangeley Plantation in Franklin County, where 4 Representatives shall be chosen—

*District Number Thirty-Six,* consisting of the municipalities of Farmington, Industry and New Sharon, 1 Representative;

*District Number Thirty-Seven,* consisting of the municipalities of Chesterville and Jay in Franklin County and the municipalities of Canton and Peru in Oxford County, 1 Representative;

*District Number Thirty-Eight,* consisting of the municipalities of Avon, Carrabasset Valley, Coplin Plantation, Dallas Plantation, Eustis, Kingfield, Madrid, New Vineyard, Phillips, Rangeley, Sandy River Plantation, Strong and Weld, and the unorganized territories of North and East Central Franklin County, 1 Representative;

*District Number Thirty-Nine,* consisting of the municipalities of Carthage, Perkins Township, Temple and Wilton in Franklin County and the municipality of Dixfield in Oxford County, 1 Representative;

In the County of Hancock, including the municipality of Isle au Haut in Knox County, but excluding the unorganized territories of East and Northwest Hancock County and the municipalities of Amherst, Aurora, Eastbrook, Franklin, Great Pond Plantation, Mariaville, Osborn Plantation and Waltham in Hancock County, where 5 Representatives shall be chosen—

*District Number Forty,* consisting of the municipalities of Bar Harbor, Gouldsboro, Lamoine, Sorrento and Winter Harbor, 1 Representative;

*District Number Forty-One,* consisting of the municipalities of Ellsworth, Hancock and Sullivan, and the unorganized territories of Central Hancock County, 1 Representative;

*District Number Forty-Two,* consisting of the municipalities of Bucksport, Dedham, Orland, Otis, Surry and Verona, 1 Representative;

*District Number Forty-Three,* consisting of the municipalities of Blue Hill, Cranberry Isles, Mount Desert, Southwest Harbor, Tremont and Trenton, 1 Representative;

*District Number Forty-Four,* consisting of the municipalities of Brooklin, Brooksville, Castine, Deer Isle, Long Island, Penobscot, Sedgwick, Stonington and Swan's Island in Hancock County, and the municipality of Isle au Haut in Knox County, 1 Representative;

In the County of Kennebec, excluding, however, the town of Oakland, where 14 Representatives shall be chosen—

*District Number Forty-Five,* consisting of the municipalities of Belgrade, Fayette, Manchester, Mount Vernon, Readfield, Rome, Vienna and Wayne, 1 Representative;

*District Number Forty-Six,* consisting of the municipalities of Monmouth and Winthrop, 1 Representative;

*District Number Forty-Seven,* consisting of the municipalities of Farmingdale, Litchfield, Randolph and West Gardiner, 1 Representative;

*District Number Forty-Eight,* consisting of the municipality of Gardiner, 1 Representative;

*District Number Forty-Nine,* consisting of the municipalities of Chelsea, Hallowell and Pittston, 1 Representative;

*District Number Fifty,* consisting of the municipalities of Sidney, Vassalboro and Windsor, and that part of the city of Augusta described as follows: Beginning at the intersection of the Augusta-Vassalboro town line and Church Hill Road; thence south along Church Hill Road to South Belfast Avenue; thence west along South Belfast Avenue to Cony Road; thence south along Cony Road to Thomaston Road; thence east along Thomaston Road to Pleasant Road; thence south along Pleasant Road to the old Augusta-Chelsea town line located 5.5 rods north of the Augusta-Chelsea line; thence east along the old Augusta-Chelsea line to the Augusta-Windsor line; thence north and west along the Augusta-Windsor line to the point of beginning, 1 Representative;

*District Number Fifty-One,* consisting of that part of the city of Augusta not included in District Number Fifty, 3 Representatives to be chosen at large;

*District Number Fifty-Two,* consisting of the municipality of Waterville, and that part of the town of Winslow described as follows: Beginning at the intersection of the Winslow-Albion town line with the East Winslow-South Albion Road; thence northwest along the East Winslow-South Albion Road to Lambs Corner Road; thence southwest along Lambs Corner Road to Lambs Corner at Route 137; thence northwest and west along Route 137 to Outlet Stream which runs into Sebasticook River; thence crossing the Sebasticook River to a road extension opposite Outlet Stream; thence north along said road extension to the Benton Road which is Alternate Route 100; thence east along Benton Road to Clinton Avenue; thence west along Clinton Avenue to a transmission line approximately 1,000 feet west of the Clinton Avenue-Benton Road intersection; thence north along the transmission line to Roderick Road; thence west along Roderick Road to Benton Avenue; thence north on Benton Avenue to Simpson Street; thence west on Simpson Street to the Winslow-Waterville town line in the Kennebec River; thence along the Winslow-Waterville town line northeasterly to the Winslow-Benton town line; thence easterly along the Winslow-Benton town line to the Winslow-Albion town line; thence southerly along the Winslow-Albion town line to the point of beginning, 3 Representatives to be chosen at large;

*District Number Fifty-Three,* consisting of that part of the town of Winslow not included in District Number Fifty-Two, 1 Representative;

*District Number Fifty-Four,* consisting of the municipalities of Albion, Benton, China, Clinton and Unity Plantation, 1 Representative;

In the County of Knox, including the municipalities of Belmont, Islesboro, Liberty, Lincolnville, Palermo and Searsmont in Waldo County, and Somerville Plantation in Lincoln County, but excluding the municipality of Isle au Haut in said Knox County, where 5 Representatives shall be chosen—

*District Number Fifty-Five,* consisting of the municipalities of Appleton, Union and Washington in Knox County, and the municipality of Somerville Plantation in Lincoln County, and the municipalities of Belmont, Islesboro, Liberty, Lincolnville, Palermo and Searsmont in Waldo County, 1 Representative;

*District Number Fifty-Six,* consisting of the municipalities of Cushing, Friendship, Matinicus Isle Plantation, North Haven, Owl's Head, South Thomaston, St. George and Vinalhaven, 1 Representative;

*District Number Fifty-Seven,* consisting of the municipalities of Camden, Hope and Rockport, 1 Representative;

*District Number Fifty-Eight,* consisting of the municipalities of Thomaston and Warren, and that part of the city of Rockland described as follows: Beginning at the in-

tersection of the Rockland-Rockport city line and the Old County Road; thence running southerly along the Old County Road to Maverick Street; thence easterly along Maverick Street to Main Street; thence southerly along Main Street to Cedar Street; thence easterly along Cedar Street to Front Street; thence southerly along Front Street to Main Street; thence south along Main Street to Rankin Street; thence west along Rankin Street to Old County Road; thence south along the Old County Road to Limerock Street; thence east along Limerock Street to Highland Street; thence south along Highland Street to the Ward 3 boundary line; thence west along the Ward 3 boundary line to the Rockland-Thomaston city line; thence west, north and east along the Rockland-Thomaston, Warren, Rockport city line to the point of beginning, 1 Representative;

*District Number Fifty-Nine,* consisting of that part of the city of Rockland not included in District Number Fifty-Eight, 1 Representative;

In the County of Lincoln, excluding the municipality of Somerville Plantation, where 3 Representatives shall be chosen—

*District Number Sixty,* consisting of the municipalities of Boothbay, Boothbay Harbor, Edgecomb, Newcastle, South Bristol and Southport, 1 Representative;

*District Number Sixty-One,* consisting of the municipalities of Alna, Dresden, Jefferson, Nobleboro, Westport Island, Whitefield and Wiscasset, 1 Representative;

*District Number Sixty-Two,* consisting of the municipalities of Bremen, Bristol, Damariscotta, Monhegan Plantation and Waldoboro, 1 Representative;

In the County of Oxford, including the unorganized territories of West Central Franklin County and the municipality of Rangeley Plantation in Franklin County, but excluding the municipalities of Canton, Dixfield and Peru in said County of Ox-

ford, where 6 Representatives shall be chosen—

*District Number Sixty-Three,* consisting of the unorganized territories of West Central Franklin County and the municipality of Rangeley Plantation in Franklin County, and the municipalities of Andover, Bethel, Byron, Gilead, Hanover, Hartford, Lincoln Plantation, Magalloway Plantation, Milton Township, Newry, Roxbury, Sumner, Upton and Woodstock, and the unorganized territories of North Oxford County in the County of Oxford, 1 Representative;

*District Number Sixty-Four,* consisting of the municipalities of Brownfield, Denmark, Fryeburg, Hiram, Lovell, Porter, Stow, Sweden and Waterford, 1 Representative;

*District Number Sixty-Five,* consisting of the municipalities of Buckfield Hebron, Paris and West Paris, 1 Representative;

*District Number Sixty-Six,* consisting of the municipalities of Greenwood, Oxford, Norway and Stoneham, and the unorganized territories of South Oxford County, 1 Representative;

*District Number Sixty-Seven,* consisting of the municipality of Mexico and that part of the town of Rumford described as follows: Beginning at the bridge across the Androscoggin River at Railroad Street; thence southwest along Railroad Street to Bridge Street; thence west and southwest along Bridge Street to Canal Street; thence north along Canal Street to Railroad Street; thence west along Railroad Street to River Street; thence south along River Street to Bridge Street; thence west along Bridge Street to Franklin Street; thence north along Franklin Street to Rumford Avenue; thence north along Rumford Avenue to Route 2 and Route 120 turnoff; thence north along Route 2 and Route 120 turnoff to Essex Avenue; thence east along Essex Avenue to Falmouth Street; thence north along Falmouth Street to Lincoln Avenue; thence west along Lincoln Avenue to Pine

Street; thence north along Pine Street to Strafford Avenue; thence west along Strafford Avenue to Maple Street; thence north along Maple Street to Porter Avenue Extension and Porter Avenue West; thence east along Porter Avenue Extension and Porter Avenue West to Somerset Avenue; thence north along Somerset Avenue to Hall Avenue; thence west along Hall Avenue to Penobscot Street; thence north along Penobscot Street to Swift Avenue; thence east along Swift Avenue to Somerset Avenue; thence south along Somerset Avenue to Tasker Avenue; thence east along Tasker Avenue to the Rumford-Mexico town line; thence south along the town line to the point of beginning; 1 Representative;

*District Number Sixty-Eight,* consisting of that part of the town of Rumford not included in District Number Sixty-Seven, 1 Representative;

In the County of Penobscot, where 19 Representatives shall be chosen—

*District Number Sixty-Nine,* consisting of the municipalities of Corinna, Dexter, Exeter and Garland, 1 Representative;

*District Number Seventy,* consisting of the municipalities of Dixmont, Hampden, Newburg and Plymouth, 1 Representative;

*District Number Seventy-One,* consisting of that part of the municipality of Millinocket described as follows: Beginning at intersection of Millinocket town line and Millinocket Stream; thence north along Millinocket Stream to a point adjacent to the intersection of York Street and Barnet Road; thence east along Barnet Road to the intersection of Prospect Street; thence north along Prospect Street to intersection of Granite Street; thence west along Granite Street to where Granite Street becomes Cherry Street; thence west along Cherry Street to where Cherry Street and Katahdin Avenue intersect; thence north along Katahdin Avenue to where Elm Street intersects Katahdin Avenue; thence west on Elm Street to where the north-south B & A Railroad tracks cross Elm Street; thence north along B & A Railroad tracks to East West Spur of B & A R.R. railroad tracks; thence west to Millinocket town line; thence along town line north, then east, then south and west to the point of beginning, 1 Representative;

*District Number Seventy-Two,* consisting of the unorganized territories of North Penobscot County, the municipalities of East Millinocket, Maxfield, Mt. Chase Plantation, Patten, Seboeis Plantation and Stacyville, and that part of the town of Millinocket not included in District Number Seventy-One, 1 Representative;

*District Number Seventy-Three,* consisting of the municipality of Orrington and that part of the city of Brewer described as follows: Beginning at the point where the Ward 4—Ward 5 boundary (as said wards are presently constituted) intersects the Brewer-Bangor Boundary; thence east along the Ward 4—Ward 5 line to the Maine Central Railroad tracks; thence north, crossing over North Main Street, to the Ward 2—Ward 3 boundary (as said wards are presently constituted); thence along the Ward 2—Ward 3 boundary line to the center line of Eastern Avenue; thence north along the center line of Eastern Avenue across Chamberlain Street to the point where the center line of Eastern Avenue intersects said Ward 2—Ward 3 line; thence west and then east along said Ward 2—Ward 3 line to the point where the lines of Wards 1, 2 and 3 (as said wards are presently constituted) meet; thence continuing east along the Ward 1—Ward 3 line to the Brewer-Holden town line; thence south along the Brewer-Holden town line to the Brewer-Orrington town line; thence west along the Brewer-Orrington town line to the Brewer-Hampden town line; thence north along the Brewer-Hampden town line and continuing along the Brewer-Bangor town line to the point of beginning, 1 Representative;

*District Number Seventy-Four,* consisting of the municipality of Veazie and that part of the city of Brewer not included in District Number Seventy-Three, 1 Representative;

*District Number Seventy-Five,* consisting of the municipalities of Carmel, Etna, Hermon, Newport and Stetson, 1 Representative;

*District Number Seventy-Six,* consisting of the municipalities of Chester, Lincoln, Medway and Woodville, 1 Representative;

*District Number Seven-Seven,* consisting of that part of the municipality of Orono located to the east of the Stillwater River with the Stillwater River running south from the Orono-Old Town boundary line to a point where the Stillwater River joins the Penobscot River, 1 Representative;

*District Number Seventy-Eight,* consisting of the municipalities of Clifton, Eddington and Holden, and that part of the town of Orono not included in District Number Seventy-Seven, 1 Representative;

*District Number Seventy-Nine,* consisting of that part of the municipality of Old Town described as follows: Beginning at the Old Town-Argyle boundary on the Penobscot River; thence south along the Penobscot River to where it branches into the Stillwater River encompassing Penobscot Indian Reservation (Orson Island) and Orono Island; thence south on Stillwater River to Gilman Falls Avenue; thence east on Gilman Falls Avenue to intersection of College Road; thence south on College Road to intersection of University Forest Road; thence east on University Forest Road to the north line of Ward 5 (as said ward is presently constituted); thence east and south along the north and east lines of said Ward 5 to the Old Town-Orono town line; thence south on Old Town-Orono boundary line; thence east on Old Town-Orono boundary line to Old Town-Bradley line; thence north on Old Town-Bradley town line to Old Town-Milford town line; thence north on Old Town-Milford town line along the Penobscot River to the point of beginning; together with all Indian Islands and that portion of the Penobscot River and its islands from the Old Town-Argyle boundary line, going north to Mattawamkeag Point, 1 Representative;

*District Number Eighty,* consisting of the municipalities of Alton, Argyle, Bradley, Grand Falls Plantation, Greenbush, Greenfield and Milford, and that part of the town of Old Town not included in District Number Seventy-Nine, 1 Representative;

*District Number Eighty-One,* consisting of the municipalities of Bradford, Charleston, Corinth, Edinburg, Glenburn, Hudson, Kenduskeag, Lagrange and Levant, 1 Representative;

*District Number Eighty-Two,* consisting of the municipalities of Burlington, Carroll Plantation, Drew Plantation, Enfield, Howland, Kingman Township, Lakeville Plantation, Lee, Lowell, Mattawamkeag, Passadumkeag, Prentiss Plantation, Springfield, Webster Plantation, Winn, and Township 3, Range 1 and Township 5, Range 1, 1 Representative;

*District Number Eighty-Three,* consisting of the municipality of Bangor, 5 Representatives to be chosen at large;

In the County of Piscataquis, including the municipalities of Cambridge, Detroit, Harmony, Palmyra, Ripley and St. Albans in Somerset County, where 3 Representatives shall be chosen—

*District Number Eighty-Four,* consisting of the municipalities of Abbott, Atkinson, Dover-Foxcroft, Guilford and Sebec, 1 Representative;

*District Number Eighty-Five,* consisting of the municipalities of Barnard Plantation, Bowerbank, Brownville, Elliotsville Plantation, Greenville, Lakeview Plantation, Medford, Milo and Willimantic, and the unorganized territories of North Piscataquis County and Southeast Piscataquis County, 1 Representative;

*District Number Eighty-Six,* consisting of the municipalities of Blanchard, Kingsbury Plantation, Monson, Parkman, Sangerville, Shirley and Wellington in Piscataquis County, and the municipalities of Cambridge, Detroit, Harmony, Palmyra, Ripley and St. Albans in Somerset County, 1 Representative;

In the County of Sagadahoc, including the municipality of Brunswick in Cumberland County, where 6 Representatives shall be chosen—

*District Number Eighty-Seven,* consisting of the municipalities of Arrowsic, Bowdoin, Georgetown, Phippsburg, Richmond, Swan Island and Woolwich, 1 Representative;

*District Number Eighty-Eight,* consisting of the municipalities of Bowdoinham and Topsham, 1 Representative;

*District Number Eighty-Nine,* consisting of the municipality of West Bath, and that part of the city of Bath described as follows: Beginning at the intersection of old U.S. Highway #1 on the Bath-West Bath boundary; thence northeasterly along old U.S. Highway #1 to its intersection with Western Avenue; thence southeasterly along Western Avenue to its intersection with Richardson Street; thence easterly along Richardson Street to its intersection with High Street; thence southerly along High Street to its intersection with Bath Street; thence easterly along Bath Street to its intersection with Washington Street; thence northerly along Washington Street to its intersection with King Street; thence easterly along King Street to its intersection with Water Street; thence northerly along Water Street to the Maine Central Railroad tracks; thence northwesterly along the railroad tracks to Washington Street; thence northerly along Washington Street to its intersection with Winter Street; thence westerly along Winter Street to its intersection with High Street; thence southerly along High Street to its intersection with Chestnut Street; thence westerly along Chestnut Street to its intersection with Lincoln Street; thence northwesterly along Lincoln Street to its intersection with North Street and Congress Avenue Extension; thence westerly along Congress Avenue Extension (formerly known as North Street) to a point where Congress Avenue Extension turns to the south; thence, however, continuing in the same general westerly direction to the Bath-West Bath boundary line; thence southeasterly along said Bath-West Bath boundary line to the point of beginning; together with that part of the town of Brunswick in Cumberland County lying east of the following described line: Beginning at the intersection of the Brunswick-Topsham boundary and the extension of a dirt road, said point being approximately 1400 feet east of the eastern end of Cow Island in Topsham; thence south along said dirt road to Route 24; thence west along Route 24 to the western boundary of the Brunswick Naval Air Station; thence to the south all along the western boundary of the Brunswick Naval Air Station and continuing along the most southerly boundary of said Brunswick Naval Air Station to the east until said boundary line reaches Princes Point Access Road at Buttermilk Cove; thence west and south along Princes Point Access Road to the Brunswick-Harpswell boundary, 1 Representative;

*District Number Ninety,* consisting of that part of the municipality of Bath not included in District Number Eighty-Nine, 1 Representative;

*District Number Ninety-One,* consisting of that part of the municipality of Brunswick in Cumberland County not included in District Number Eighty-Nine, 2 Representatives to be chosen at large;

In the County of Somerset, including the municipality of Oakland in Kennebec County, but excluding the municipalities of Cambridge, Detroit, Harmony, Palmyra, Ripley and St. Albans in Somerset County, where 6 Representatives shall be chosen—

*District Number Ninety-Two,* consisting of the municipalities of Canaan, Hartland and Pittsfield, 1 Representative;

*District Number Ninety-Three,* consisting of that part of the municipality of Skowhegan described as follows: Beginning at the point where the Norridgewock-Skowhegan town line intersects the Kennebec River; thence northeast on the Skowhegan town line to its intersection with the Wesserunsett Stream; thence south on the Stream to the Kennebec River; thence west on the river to a point adjacent to the extension of an unnamed road, which runs north from U.S. 201 and which is located 1500 feet up-stream from the intersection of the Wesserunsett Stream and Kennebec River; thence south along unnamed road to its intersection with Route 201; thence west along Route 201 to Bigelow Street; thence south on Bigelow Street and continuing along unnamed road to Main Street; thence along Main Street approximately 3500 feet to an unnamed road, intersecting from the west at utility pole # 9/31; thence west on unnamed road to intersection of unnamed stream approximately 700 feet from Main Street; thence west on unnamed stream to the extension of an unnamed road approximately 2500 feet from the previous unnamed road; thence northwest on unnamed road to West Front Street; thence west on West Front Street to the Skowhegan-Norridgewock boundary; thence north along Skowhegan-Norridgewock boundary to point of beginning, 1 Representative;

*District Number Ninety-Four,* consisting of the municipality of Fairfield and that part of the town of Skowhegan not included in District Number Ninety-Three, 1 Representative;

*District Number Ninety-Five,* consisting of the municipalities of Cornville, Madison and Norridgewock, 1 Representative;

*District Number Ninety-Six,* consisting of the municipalities of Athens, Bingham, Brighton, Caratunk Plantation, Dennistown Plantation, Embden, Highland Plantation, Jackman, Moose River, Moscow, New Portland, Pleasant Ridge Plantation, Solon, The Forks Plantation and West Forks Plantation, and the unorganized territories of Central Somerset County and North Somerset County, 1 Representative;

*District Number Ninety-Seven,* consisting of the municipalities of Anson, Mercer, Smithfield and Starks in Somerset County, and the municipality of Oakland in Kennebec County, 1 Representative;

In the County of Waldo, excluding, however, the municipalities of Belmont, Islesboro, Liberty, Lincolnville, Palermo and Searsmont, where 3 Representatives shall be chosen—

*District Number Ninety-Eight,* consisting of the municipalities of Belfast and Northport, 1 Representative;

*District Number Ninety-Nine,* consisting of the municipalities of Frankfort, Prospect, Searsport, Stockton Springs, Swanville and Winterport, 1 Representative;

*District Number One Hundred,* consisting of the municipalities of Brooks, Burnham, Freedom, Jackson, Knox, Monroe, Montville, Morrill, Thorndike, Troy, Unity and Waldo, 1 Representative;

In the County of Washington, including the unorganized territories of South Aroostook County and the municipalities of Amity, Bancroft, Cary Plantation, Glenwood, Haynesville, Macwahoc Plantation, Orient, Reed Plantation and Weston in Aroostook County, together with the unorganized territories of North Hancock County and the municipalities of Amherst, Aurora, Eastbrook, Franklin, Grand Pond Plantation, Mariaville, Osborn and Waltham in Hancock County, where 5 Representatives shall be chosen—

*District Number One Hundred One,* consisting of the unorganized territories of North Washington County, and the municipalities of Alexander, Charlotte, Codyville Plantation, Cooper, Crawford, Danforth, Grand Lake Stream Plantation, Pembroke, Plantation No. 14, Plantation No. 21, Princeton, Robbinston, Talmadge, Vanceboro and Waite in Washington County, and the unorganized territories of South Aroo-

stook County and the municipalities of Amity, Bancroft, Cary Plantation, Glenwood, Haynesville, Macwahoc Plantation, Orient, Reed Plantation and Weston in Aroostook County, 1 Representative;

*District Number One Hundred Two*, consisting of the municipalities of Baileyville, Baring, Calais and Meddybemps, 1 Representative;

*District Number One Hundred Three*, consisting of the unorganized territories of East Central Washington County, and the municipalities of Cutler, Dennysville, Eastport, Lubec, Northfield, Perry, Wesley and Whiting, 1 Representative;

*District Number One Hundred Four*, consisting of the municipalities of East Machias, Jonesboro, Jonesport, Machias, Machiasport, Marshfield, Roque Bluffs and Whitneyville, 1 Representative;

*District Number One Hundred Five*, consisting of the municipalities of Addison, Beals, Beddington, Centerville, Cherryfield, Columbia, Columbia Falls, Deblois, Harrington, Milbridge and Steuben in Washington County, and the unorganized territories of North Hancock County and the municipalities of Amherst, Aurora, Eastbrook, Franklin, Grand Pond Plantation, Mariaville, Osborn and Waltham in Hancock County, 1 Representative;

In the County of York, where 17 Representatives shall be chosen—

*District Number One Hundred Six*, consisting of the municipality of York and that part of the town of Kittery described as follows: Beginning at the intersection of Route 103 and an unnamed creek 0.22 miles northeast of the intersection of Route 103 and Cutts Island Lane; thence east and south along said unnamed creek into Chauncey Creek; thence west along Chauncey Creek to Pepperell Cove; thence south between Gerrish Island and Phillip Island; thence southwest through Pepperell Cove on a line running to the north of Gooseberry Island; thence west through Pepperell Cove and Portsmouth Harbor;

thence north along Spruce Creek; thence east along Crocketts Brook to its intersection with Haley Road; thence east in a straight line to point of beginning, 1 Representative;

*District Number One Hundred Seven*, consisting of that part of the municipality of Kittery described as follows: Beginning at the intersection of the Maine-New Hampshire boundary and U.S. Highway I-95; thence northeast along U.S. Highway I-95 to the intersection of U.S. Highway I-95 and a brook which runs into Gerry Cove; thence east along said brook and Gerry Cove to Spruce Creek; thence south along Spruce Creek into Portsmouth Harbor and continuing south to the Maine-New Hampshire boundary; thence west along the Maine-New Hampshire boundary to the point of beginning; excepting, however, from this District the area of the Piscataqua River south of Seavey Island, 1 Representative;

*District Number One Hundred Eight*, consisting of the municipality of Eliot and that part of the town of Kittery not included in District Number One Hundred Six and District Number One Hundred Seven, 1 Representative;

*District Number One Hundred Nine*, consisting of the municipalities of Berwick and South Berwick, 1 Representative;

*District Number One Hundred Ten*, consisting of the municipalities of North Berwick and Wells, 1 Representative;

*District Number One Hundred Eleven*, consisting of the municipalities of Alfred and Kennebunk, 1 Representative;

*District Number One Hundred Twelve*, consisting of the municipalities of Acton, Lebanon and Shapleigh, and that part of the town of Sanford described as follows: Beginning at the intersection of Main Street and Deering Neighborhood Road; thence running south to the intersection of Bridge, Oak and Main Streets; thence northeast on Bridge Street to the intersection of State Highway 224 (Shaw's Ridge

Road); thence southeast along 224 to the intersection of Shaw Road; thence south along Shaw Road to the intersection of River Street; thence north on River Street to the intersection of Wm. Oscar Emery Drive; thence south on Wm. Oscar Emery Drive to the intersection of Front Street; thence south on Front Street to the intersection of Main Street; thence northwest on Main Street to the intersection of North Street; thence south along North Street to the intersection of Grandview Avenue; thence west along Grandview Avenue to the intersection of Douglas Street; thence south on Douglas Street to the intersection of Hanson Ridge Road; thence northwest on Hanson Ridge Road to the intersection of Route 11A; thence northeast on Route 11A to a point where an abandoned Railroad grade crosses Route 11A; following the abandoned Railroad grade northwest and southwest to the intersection of Hanson Ridge Road; thence northwest on Hanson Ridge Road to intersection of Deering Neighborhood Road; thence northeast on Deering Neighborhood Road to the point of beginning, 1 Representative;

*District Number One Hundred Thirteen,* consisting of that part of the municipality of Sanford not included in District Number One Hundred Twelve, 2 Representatives to be chosen at large;

*District Number One Hundred Fourteen,* consisting of the municipalities of Arundel, Kennebunkport, Lyman and Waterboro, and that part of the city of Biddeford described as follows: being that part of the city of Biddeford east of the following described lines: beginning at the intersection of the Biddeford-Saco boundary and the extension of the unnamed street terminating west of a rock jetty at the mouth of the Saco River; thence south along the unnamed street to Hills Beach Road; thence south along Hills Beach Road to the Old Pool Road; thence southerly along Old Pool Road to Newtown Road; thence west along Newtown Road to West Street; thence west along West Street to Guinea Road; thence south along Guinea Road to the Biddeford-Kennebunkport boundary, 1 Representative;

*District Number One Hundred Fifteen,* consisting of that part of the municipality of Biddeford not included in District Number One Hundred Fourteen, 3 Representatives to be chosen at large;

*District Number One Hundred Sixteen,* consisting of the municipalities of Cornish, Dayton, Hollis, Limerick, Limington, Newfield and Parsonsfield, 1 Representative;

*District Number One Hundred Seventeen,* consisting of the municipality of Old Orchard Beach and that part of the city of Saco described as follows: Beginning at the intersection of the Old Orchard Beach-Saco boundary and the Boston and Maine Railroad tracks; thence southwest along the Boston and Maine Railroad tracks to Ferry Road; thence east along Ferry Road to Ferry Lane; thence south along Ferry Lane to the Biddeford-Saco boundary in the Saco River; thence east along the Biddeford-Saco boundary to the Atlantic Ocean; thence northwest to the Old Orchard Beach-Saco boundary; thence west along said boundary line to the point of origin, 1 Representative;

*District Number One Hundred Eighteen,* consisting of the municipality of Buxton, and that part of the city of Saco described as follows: Beginning at the intersection of the Saco-Scarborough boundary and Henry Road; thence south along Henry Road to Flag ₀ Pond Road; thence east along Flag Pond Road to Jenkins Road; thence south along Jenkins Road to Buxton Road; thence east along Buxton Road and North Street to Spring Street; thence south along Spring Street to Lincoln Street; thence west along Lincoln Street to the abandoned Boston and Maine Railroad tracks; thence south along the abandoned Boston and Maine Railroad tracks to the Saco-Biddeford boundary; thence west, north, and east along the Saco-Biddeford boundary to the point of beginning, 1 Representative;

*District Number One Hundred Nineteen,* consisting of that part of the city of Saco not included in District Number One Hundred Seventeen and District Number One Hundred Eighteen, 1 Representative.

So ordered.

It is further ordered that the within order, together with the preliminary statement of guidelines followed by the Court in the discharge of its constitutional obligation, be deposited with the Secretary of State in the office of the Secretary of State and by him, the Honorable Joseph T. Edgar, Secretary of State, be received, recorded and preserved in said office as the official action of this Court pursuant to Article IV, Part First, §§ 2 and 3 of the Constitution of Maine.

ARMAND A. DUFRESNE, Jr.
Chief Justice

RANDOLPH A. WEATHERBEE,
CHARLES A POMEROY,
SIDNEY W. WERNICK,
JAMES P. ARCHIBALD,
THOMAS E. DELAHANTY

Associate Justices.